301 CLIFTON PLACE L.L.C., et al., Appellants,

v.

301 CLIFTON PLACE CONDOMINIUM ASSOCIATION, Respondent,

and

Kraus–Anderson Construction Company, Third–Party Plaintiff,

v.

Ramsey Excavating Company, a/k/a Ramsey Excavating and Kremer & Davis, Inc., Third–Party Defendants.

No. A09–1293.

Court of Appeals of Minnesota.

June 1, 2010.

 

Thomas E. Jamison, Adam A. Gillette, Fruth, Jamison & Elsass, PLLC, Minneapolis, MN, for appellants.

M.T. Fabyanske, Thomas A. Forker, Hannah R. Stein, Fabyanske, Westra, Hart & Thomson, P.A., Minneapolis, MN, for respondent.

Considered and decided by BJORKMAN, Presiding Judge; KALITOWSKI, Judge; and MINGE, Judge.

## OPINION

MINGE, Judge.

This litigation arises out of alleged misrepresentations in sales of new condominiums. The district court granted respondent purchasers relief. Appellants (the developer, a related entity that purchased unsold units, and the principal investor in and manager of both entities) claim the district court erred by (1) allowing appellant business entities to appear at trial without counsel; (2) violating appellants' right to a jury trial; (3) finding appellant manager waived personal service; (4) finding appellant developer violated the Minnesota Consumer Fraud Act (MCFA) by misrepresenting the floors as hardwood; (5) finding appellant developer breached the contract by installing flooring that was not hardwood; (6) finding appellant developer breached statutory warranties; (7) piercing the corporate veil of appellant developer; (8) entering judgment against one of the appellants without explicitly finding that entity liable on any claims; (9) awarding attorney fees without necessary analysis; and (10) not ordering disclosure of respondent's settlement with a codefendant. We affirm.

## FACTS

In 2002, appellant David Nixon formed appellant 301 Clifton Place, LLC (301 Clifton) to develop a 44-unit condominium project near Loring Park in Minneapolis. In 2004, Nixon formed appellant Clifton Properties, LLC (CP) to purchase and re-sell the remaining 11 condominium units following initial sales. Both 301 Clifton and CP were Nevada limited-liability corporations (LLC) managed by Nixon. In developing the condominiums, 301 Clifton hired other firms, including Kraus–Anderson Construction Company (KA) as general contractor. Respondent 301 Clifton Place Condominium Association is an association of purchasers of 301 Clifton's condominiums. Respondent's members purchased units during the initial sales phase from September 2003 to March 2005.

During the marketing of the condominiums for this project, individual purchasers were informed by representatives of 301 Clifton that the units would have hardwood floors. They testified that the prospect of hardwood flooring was a factor that induced them to purchase their units.

During construction, 301 Clifton had the contractor install sheets of what is known as engineered wood flooring that contains layers of wood and other artificial material. This flooring has a top layer of hardwood that is 1/13 inch thick and appears to be strips of hardwood, a second layer of softwood that is three millimeters thick, and artificial material between the layers. Respondent's expert testified at length to the inferior quality of such sheets of engineered flooring compared to hardwood flooring. In particular, engineered flooring is not as stable or durable, cannot be sanded and restained, and is vulnerable to swelling and shrinking from humidity.

The purchase agreements contained exhibits, addenda, receipts, and other pages with specifications, some in smaller type and abbreviated language. The various specifications attachments identified the flooring as "wood," "Award," and "Long-strip." The purchase agreement itself included an integration clause disclaiming any reliance by the parties on representations not expressed in the agreement. One of the attachments was a modification of the statute of limitations for warranty claims that was signed by Nixon and individual purchasers.

After the initial sales phase, 11 unsold units were transferred from 301 Clifton to CP.[1] Although the purchase agreement indicated that the sale price was "$500 or less," CP claims that a promissory note for one million dollars payable to 301 Clifton was consideration for the purchase. In 2004, the value of these 11 unsold units was over five million dollars. On December 27, 2005, Nixon transferred $999,999.99 to CP, CP transferred the same amount to 301 Clifton as payment on

the promissory note, and 301 Clifton transferred $1,035,000 to Nixon.

Between January and April 2006, CP sold nine of its newly acquired 11 units though a mortgage broker. All proceeds from those purchases, totaling over 3.1 million dollars, were transferred from CP to Nixon. The buyers all defaulted on the financing of these sold units and all nine are now in foreclosure. CP later transferred one unit back to 301 Clifton, which in turn transferred the unit as payment to KA. In November 2007, the last unit was sold to Nixon's daughter.

With all of 301 Clifton's units sold, Nixon filed articles of dissolution for 301 Clifton on May 10, 2006. Nixon was aware of potential warranty claims regarding the flooring. But he asserts that he maintained capital in 301 Clifton as a dissolved entity because two units sold to CP in January 2005 included the right to require a reconveyance by CP. On December 1, 2008, Nixon revoked CP's status as an LLC. Neither 301 Clifton nor CP currently has any assets.

Respondent sued 301 Clifton and KA by a complaint dated September 28, 2006, and served on 301 Clifton on December 7, 2006. The suit initially alleged faulty construction. After the complaint was filed, a dispute arose among the parties regarding a parking-garage space that respondent claims was reserved as a resident car-wash area. In e-mails regarding the dispute, Nixon repeatedly argued that the parking spot was his personal, rather than CP's, property.

On February 12, 2008, respondent served a motion for a temporary restraining order (TRO) to prevent sale of the

---

**1.** The parties offer different dates for this transfer. The purchase agreement and warranty deed are dated January 2005. The district court's findings say the units were transferred in January 2006. If this was an erroneous finding, it is clear that it did not affect the district court's conclusions or constitute prejudice to appellants.

garage unit. Respondent also amended its complaint on February 15, 2008, by adding Nixon and CP as parties and adding claims based on the failure to deliver the garage space and hardwood floors. Not knowing Nixon's then-current location, respondent e-mailed and sent the amended complaint to Nixon's last known address the day it was filed. On February 18, Nixon replied to the amended complaint and TRO motion in an e-mail and attached a letter addressed to the court. Nixon requested the letter be read into the record "as ... written testimony and evidence." He also filed a second letter with the district court that was read into the record at the hearing. These letters claim that CP owns the garage space and was not a listed defendant, and that 301 Clifton never promised that space to respondent or individual purchasers.

The district court granted the TRO on February 19 and scheduled a preliminary-injunction hearing. Prior to the hearing, appellants, including Nixon, filed a motion to delay the hearing that was denied on March 4. The preliminary injunction was granted on March 11.

Then, on July 9, appellants moved to dismiss the suit and vacate the injunction based on insufficient process and failure to state a claim. Nixon argued in a separate affidavit that the e-mail he received with the TRO motion and amended complaint did not satisfy service requirements. The district court denied the motion and observed that appellants received copies of the amended complaint and motion papers and that Nixon waived service requirements by previously arguing the merits of the action.

Trial was scheduled for February 2009. Prior to trial, the parties settled their dispute regarding the garage space and respondent settled separately with KA. There is no record of any pretrial discovery request for the terms of this settlement. Three weeks before trial, appellants' attorney withdrew representation. Nixon, who is not an attorney, said he would represent himself and the LLC appellants. Also at some point before trial, the parties agreed to try the case to the district court without a jury. There is no record of this agreement, but the district court noted in its posttrial order that there had been a stipulation for a bench trial. Appellants never objected to the lack of a jury until after the trial ended and the district court's decision was released.

Following trial, the district court entered findings of fact, conclusions of law, and an order for judgment. The district court found that respondent buyers relied on the false promise that their units would have hardwood floors and that the parties did not alter the statute of limitations. The district court concluded that appellant 301 Clifton (a) did not breach the warranty for no construction defects; (b) violated the MCFA; (c) breached statutory implied warranties; (d) breached the purchase agreement; and (e) breached statutory express warranties. The district court also found that Nixon was the alter ego of 301 Clifton and CP under Nevada law and that Nixon was responsible for their liabilities. The district court awarded actual damages of $213,540.11 based on the cost of replacing the building's floors. It also awarded attorney fees of $179,489.94 under fee-shifting provisions in Minn.Stat. § 515B.4–116(b) (2008).

After the entry of judgment, appellants filed a pro se motion for a new trial. Appellants retained new counsel one day prior to the hearing on the posttrial motions. The district court allowed supplemental briefing from newly retained counsel. The district court denied appellants' motion for a new trial. This appeal followed.

## ISSUES

I. Are certain submitted materials outside the reviewable record on appeal?

II. Did the district court err by not granting a new trial as a result of allowing Nixon, who is not an attorney, to appear on behalf of appellant business entities?

III. Did the district court err by finding appellants waived a jury trial?

IV. Did the district court err by finding that appellant Nixon waived an insufficient-service defense?

V. Did the district court err by finding that appellant 301 Clifton violated the MCFA, Minn.Stat. § 325F.69 (2008)?

VI. Did the district court err by finding appellant 301 Clifton in breach of contract?

VII. Did the district court err by (a) finding ineffective the statute-of-limitations modification for statutory warranties and, (b) if the warranty claims were brought within the limitations period, finding that appellant 301 Clifton breached express and implied warranties under Minn.Stat. § 515B.4–112–113 (2008)?

VIII. Did the district court err by finding Nixon an alter ego of 301 Clifton and CP under Nevada law?

IX. Did the district court err by rendering judgment against CP when its findings only indicated that 301 Clifton incurred liabilities?

X. Did the district court abuse its discretion by awarding attorney fees?

XI. Did the district court abuse its discretion by denying appellants' posttrial motion for disclosure of the terms of settlement between respondent and KA?

## ANALYSIS

■ This case involves determinations by the district court of both fact and law.

The court of appeals does not set aside fact findings unless they are clearly erroneous. Minn. R. Civ. P. 52.01. This court reviews questions of law de novo. *In re Collier*, 726 N.W.2d 799, 803 (Minn.2007).

## I.

■ As a threshold matter, we address two motions to strike documents submitted to this court. The first motion, sought by respondent, is to strike materials attached to appellant's brief and references to those documents within the brief. The materials include an affidavit from Nixon, an online biography of and educational materials created by appellants' former counsel, and information taken from internet sites concerning wood flooring.

■ The papers filed in the district court, the exhibits, and the transcript of the proceedings, if any, shall constitute the record on appeal. Minn. R. Civ.App. P. 110.01. This court will generally not consider matters presented for the first time on appeal. *Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn.1988). Appellants do not dispute that the challenged materials are not part of the district court record; rather they argue we should not strike these documents because (a) the various statements by Nixon in the documents are uncontroverted and otherwise supported by the record and (b) the other documents are publicly available.

■ Courts may consider new material that is documentary, uncontroverted, and supportive of the district court's ruling. *Village Apartments v. State*, 335 N.W.2d 717, 718 n. 3 (Minn.1983). This exception does not apply here because the challenged documents were offered to reverse, not affirm, the district court's decision. *See Plowman v. Copeland, Buhl & Co.*, 261 N.W.2d 581, 584 (Minn.1977) ("[P]roduction of record evidence is never allowed in

an appellate court for the purpose of reversing a judgment.").

■ Although we may consider publicly available legal materials not presented to the district court, *State v. Rewitzer*, 617 N.W.2d 407, 411 (Minn.2000), we strike such materials if they are "evidentiary in nature." *Hinneberg v. Big Stone County Hous. & Redevelopment Auth.*, 706 N.W.2d 220, 224 (Minn.2005). The documents submitted by appellants are submitted as factual evidence to support several arguments on appeal. The public-documents exception for legal material also does not apply.

Appellants lastly rely on the principle that appellate courts can consider a new theory on appeal if it "is plainly decisive of the entire controversy on its merits, and where [facts are undisputed,] there is no possible advantage or disadvantage to either party in not having had a prior ruling by the trial court on the question." *Watson v. United Servs. Auto. Ass'n*, 566 N.W.2d 683, 687 (Minn.1997) (quotation and emphasis omitted). Appellants argue the *Watson* exception is not limited to new arguments but extends to new materials. But one of the factors favoring review of a new issue under *Watson* is that the issue is not dependent on new or controverted facts. *Id.* at 688. Based on that consideration, the *Watson* exception is not applicable.

We grant respondent's motion to strike appellants' materials and references thereto in appellants' brief. We do not request a redacted brief because appellants' references are easily disregarded in our review. The analysis below on the substantive issues raised by appellants accordingly does not consider those stricken materials.

■ The second motion, sought by appellants, was to strike as untimely respondent's submitted reply in support of the first motion. The rules require a reply to a response to a motion to be served within two days. Minn. R. Civ.App. P. 127. This period does not include intermediate nonworking days. Minn. R. Civ. P. 6.01. A party must show substantial prejudice to obtain an order striking an untimely response to a motion. *In re Welfare of D.B.*, 463 N.W.2d 301, 303 (Minn.App.1990). Appellants' response to the motion was served on Thursday, December 10, 2009. Respondent's reply was served on Tuesday, December 15. Disregarding weekend days, this reply was served one day late. But because appellants show no prejudice from the short delay, we deny appellants' motion to strike respondent's reply.

## II.

■ Moving to the merits of the appeal, we address the issue of whether the district court erred by allowing Nixon, who is not an attorney, to appear for CP and 301 Clifton. Appellants argue a new trial should be granted because LLC members who are not licensed to practice law may not represent the LLC to the court. Although appellant LLCs did not raise the issue until after trial, we address it because appellant LLCs raised it below once they regained counsel and recognized the rule.

"It is well settled under Minnesota common law that a corporation must be represented by an attorney in legal proceedings." *Save Our Creeks v. City of Brooklyn Park*, 699 N.W.2d 307, 309 (Minn.2005). This rule is motivated by "ethical and professional considerations":

A non-attorney agent of a corporation is not subject to the ethical standards of the bar and is not subject to court supervision or discipline. The agent knows but one master, the corporation, and owes no duty to the courts. In addition, a corporation is an artificial

entity which can only act through agents. To permit a lay individual to appear on behalf of a corporation would be to permit that individual to practice law without a license.

*Id.* (quoting *Nicollet Restoration, Inc. v. Turnham,* 486 N.W.2d 753, 754 (Minn. 1992)). Respondent concedes that this rule extends beyond business corporations and applies to LLCs. We agree.

■ The next question is the remedy for improper nonattorney representation of LLCs. The district court found posttrial that "the appropriate remedy . . . is not a new trial, but an entry of default judgment" against the LLCs. Drawing on the rule's purposes outlined above, the district court concluded that the rule protects the courts rather than companies. The district court reasoned that failure to obtain an attorney equated to a nonappearance by the company and that as a result both CP and 301 Clifton "were in default on the first day of trial." The district court did not, however, retroactively order default judgment.

In *Save Our Creeks,* our supreme court addressed the consequences of a corporation's failure to have attorney representation before the district court. 699 N.W.2d at 309–10. There, a corporation filed a complaint without an attorney's signature. *Id.* at 309. The district court found the flawed complaint was not a legal nullity that barred jurisdiction, but instead was a "defect" that the corporate party could reasonably cure through a backdated amendment. *Id.* at 310. The supreme

court declined to sanction the corporation or dismiss the action; rather, it gave courts discretion to sometimes allow amendment based on "considerations of fault, diligence, and prejudice." *Id.* (quoting court of appeals opinion).

We note that the corporate-counsel rule is meant to serve primarily the judicial system and secondarily the opposing party by preventing unscrupulous tactics by nonattorney representatives owing no ethical allegiances to the court. *Nicollet Restoration,* 486 N.W.2d at 754. The rule has not been described to protect corporate litigants. *Id.* A corporation cannot claim it is prejudiced by its own violation of the rule and bootstrap itself into a basis for another trial. The *Save Our Creeks* court was lenient in dealing with a violation of the rule by allowing the corporation to retroactively cure a defective pleading; it did not require a retrial any time a corporation/LLC was in violation. 699 N.W.2d at 310–11; *see also Metro Bldg. Co. v. RAM Bldgs., Inc.,* 783 N.W.2d 204 (Minn.App. 2010) (relying on *Save Our Creeks* to conclude that district court may retroactively cure a complaint that misstates the corporate plaintiff's registered name). Reversing the verdict after a completed trial would prejudice respondent and consume substantial judicial resources. The intent of safeguarding the interests of the judicial system would be stood on its head for the benefit of the misguided ownership of the LLC. We affirm the district court's refusal to grant a new trial.[2]

---

**2.** If there had been an objection to CP and 301 Clifton's nonattorney representation and the LLCs had proceeded without counsel, default judgment may have been appropriate. *Nicollet Restoration,* 486 N.W.2d at 756 (affirming dismissal with prejudice of action where corporation would not procure counsel); 8 A.L.R. 5th 653 (noting that, unless exception applies, default judgment will result

if corporation will not be represented by counsel). But here respondent did not file its own notice of related appeal requesting reversal of the district court and an entry of default judgment against appellant LLCs. Therefore, that claim is not properly before us, and we do not address it. *See City of Ramsey v. Holmberg,* 548 N.W.2d 302, 305 (Minn.App. 1996) (noting that respondent's failure to file

## III.

The third issue is whether appellants' rights to a jury trial were violated. The Minnesota Constitution provides a right to trial by jury in all claims at law. Minn. Const. art. I, § 4. This right, however, can be waived in civil settings where "an intention to do so appears affirmatively or by necessary inference from unequivocal acts or conduct." *Hasey v. McMullen*, 109 Minn. 332, 337, 123 N.W. 1078, 1080 (1909). An agreement to a bench trial effectively waives the jury right. · *See Ottman v. Fadden*, 575 N.W.2d 593, 597 (Minn.App.1998) ("[T]he constitutional right to a jury trial may be waived by the parties' agreement."). The failure to make a timely demand for a jury also constitutes "an unequivocal act from which the waiver is a necessary inference." *Schweich v. Ziegler, Inc.*, 463 N.W.2d 722, 728 (Minn. 1990).

Although the case was originally scheduled for a jury trial, the district court stated in its posttrial ruling that the parties stipulated off the record to a bench trial. Appellants made no efforts to correct the record on this point.[3] We also note there was no objection during the trial to the absence of a jury. The point was first raised after the district court issued its findings/conclusions/order deciding the case against appellants. Based on this record, we conclude that the district court did not err in finding an agreement to proceed without a jury.

## IV.

The fourth issue is whether the district court erred by finding Nixon waived service. Even though he was found to be an alter ego of 301 Clifton, Nixon still must be served to be subject to the court's jurisdiction. *See Strange v. 1997 Jeep Cherokee*, 597 N.W.2d 355, 358 (Minn.App.1999). The parties concede that respondent failed to properly effect personal service on Nixon. *See* Minn. R. Civ. P. 3.01. The district court, however, concluded that Nixon waived his lack-of-service defense. The issue of whether the service requirement was satisfied or waived is a question of law. *Shamrock Dev., Inc. v. Smith*, 754 N.W.2d 377, 382 (Minn.2008).

A defendant who submits himself to the jurisdiction of the court cannot later raise a defense of insufficient service. *Miss. Valley Dev. Corp. v. Colonial Enters., Inc.*, 300 Minn. 66, 72, 217 N.W.2d 760, 764 (1974); *see also* Minn. R. Civ. P. 12.08 (finding certain procedural defenses waived if not raised in motion to dismiss or answer). An improperly served defendant submits to the district court's jurisdiction if "the defendant has taken some affirmative step invoking the power of the court

a notice of review limits issues to those raised in appellant's notice of review), *review denied* (Minn. Aug. 6, 1996).

**3.** Appellate rules provide,

If any difference arises as to whether the record truly discloses what occurred in the trial court, the difference shall be submitted to and determined by the trial court and the record made to conform. If anything material to either party is omitted from the record by error or accident or is misstated in it, the parties by stipulation, or the trial court, either before or after the record is transmitted to the appellate court, or the appellate court, on motion by a party or on its own initiative, may direct that the omission or misstatement be corrected, and if necessary that a supplemental record be approved and transmitted.

Minn. R. Civ.App. P. 110.05. This mechanism is specifically designed to address claims by appellate litigants that the record is incomplete or inaccurate, and would have been the appropriate route for appellants to take if they believed that no bench-trial stipulation actually occurred.

or implicitly recognizing its jurisdiction." *Peterson v. Eishen,* 512 N.W.2d 338, 340 (Minn.1994). This occurs when the defendant "fail[s] to provide the court an opportunity to rule on the [insufficient service] defense before affirmatively invoking the courts jurisdiction on the merits of the claim." *Patterson v. Wu Family Corp.,* 608 N.W.2d 863, 868 (Minn.2000).

■ Appellant Nixon was not named in the original action; though he was fully aware of the litigation because he participated on behalf of 301 Clifton. Nixon was named in the amended complaint. Nixon was e-mailed the summons, amended complaint, and TRO motion the day they were filed. Having received these documents, Nixon twice replied and attached two letters addressed to the district court—letters he submitted as "written testimony and evidence." These letters argued the merits of the TRO motion, claiming that 301 Clifton neither owned the garage unit in question nor promised it to respondent. After the injunction was granted in favor of respondent, appellant Nixon sought to vacate the injunction and dismiss the complaint based on insufficient service. On this record, we conclude that the district court did not abuse its discretion in determining that Nixon raised his insufficient-service defense well after he submitted evidence and arguments concerning the merits of the suit and thus waived the defense.

## V.

■ The fifth issue is whether the district court erred by finding 301 Clifton violated the MCFA. The MCFA penalizes fraud or misrepresentation "with the intent that others rely" on the false promise in purchasing "any merchandise." Minn. Stat. § 325F.69, subd. 1. "Merchandise"

includes real estate. Minn.Stat. § 325F.68, subd. 2 (2008). In order to obtain monetary remedies under the MCFA, a private party must show the requisite type of action and injury and that the action will benefit the public.[4] Minn. Stat. § 8.31, subd. 3a (2008); *see Ly v. Nystrom,* 615 N.W.2d 302, 314 (Minn.2000) (holding that Minn.Stat. § 8.31 "applies only to those claimants who demonstrate that their cause of action benefits the public"). Liability does not require that the false statement be intentional. *Meyer v. Dygert,* 156 F.Supp.2d 1081, 1086 (D.Minn. 2001). But a successful claimant must prove that he or she relied on the falsehood to show causation. *Group Health Plan, Inc. v. Philip Morris Inc.,* 621 N.W.2d 2, 13 (Minn.2001).

Appellants claim the district court erred in finding that 301 Clifton misrepresented that units would have hardwood floors and that respondent buyers relied on those promises. Appellants concede that there were hardwood-floor representations. The dispute regards whether that statement was objectively false (i.e., whether hardwood floors include engineered wood flooring) and whether the written contract precludes this MCFA claim.

Respondent's expert testified that the flooring received primarily constituted softwood and manufactured product. He stated that the industry would not classify such flooring as *hardwood.* Though appellants claim that the installing contractor testified that the manufactured flooring is in the hardwood category, the contractor actually stated that such product is in "the wood flooring category." After considering this testimony and common meanings, the district court found that the flooring received by respondent buyers is not what

---

4. Appellants do not claim that this cause of action does not benefit the public or that, if

true, the alleged action does not constitute the requisite fraud.

a reasonable person would consider *hardwood*.

The only hardwood within the flooring received by respondent buyers is a 1/13–inch–thick veneer. At best, it is self-evident that flooring that is not primarily hardwood is not *hardwood* flooring. At worst, the meaning of *hardwood flooring* is ambiguous—depending on the proportion of hardwood in the sheets as installed. In this setting, we defer to the district court's factual findings. Those findings were that the floors installed were not the hardwood flooring represented to the buyers. The expert testimony presented at trial provides clear support for this finding. We conclude the district court did not err in finding the delivered flooring was not as promised.

■■■ Appellants also dispute that respondent buyers relied on the hardwood-floor promise because all buyers signed a purchase agreement stating they did not rely on prior statements. When statements are challenged as fraudulent, courts may review evidence that arose before an integrated contract was executed. *Johnson Bldg. Co. v. River Bluff Dev. Co.*, 374 N.W.2d 187, 193 (Minn.App.1985), *review denied* (Minn. Nov. 18, 1985). And, although a written agreement in clear contradiction with prior misrepresentations will defeat a claim for common-law fraud, it does not defeat one for statutory fraud: "the existence of a written contract that contradicts [the claimant's] alleged oral misrepresentations does not, as a matter of law, negate any possibility of . . . proving a causal nexus between oral representations and consumer injuries." *Wiegand v. Walser Auto. Groups, Inc.*, 683 N.W.2d 807, 812–13 (Minn.2004).

We note that the contract terms do not contradict previous promises of hardwood

floors.[5] But even if they did, *Wiegand* allows a statutory-fraud claim to proceed on causal reliance despite a conflicting contract with an integration clause. *Id.* at 812. The district court referenced multiple statements and materials that represented hardwood floors. It also credited respondent's testimony that buyers relied on the hardwood-floor promise in making their purchases. We conclude that the district court did not err by finding the MCFA violation.

## VI.

■■■ The sixth issue is whether the district court erred by finding that 301 Clifton breached the purchase agreement by not delivering hardwood floors. The district court found that buyers entered into written purchase agreements in which they were promised hardwood floors. Although it is undisputed that hardwood floors were promised before the agreements were signed, the agreements did not provide explicitly for *hardwood* floors.

■■■ "The primary goal of contract interpretation is to determine and enforce the intent of the parties." *Travertine Corp. v. Lexington–Silverwood*, 683 N.W.2d 267, 271 (Minn.2004). The parties' intent is determined from the plain language of the instrument itself. *Id.* If the contract is unambiguous, its language must be given its plain and ordinary meaning. *Brookfield Trade Ctr., Inc. v. County of Ramsey*, 584 N.W.2d 390, 394 (Minn.1998). If ambiguous, outside circumstances can be considered to determine the parties' intentions. *Metro. Airports Comm'n v. Noble*, 763 N.W.2d 639, 645 (Minn.2009). Determining the construction of unambiguous contract language and determining the existence of ambiguity are legal questions. *Art Goebel, Inc. v. N. Suburban Agencies,*

---

5. This issue is further discussed in the next section.

*Inc.*, 567 N.W.2d 511, 515 (Minn.1997); *Turner v. Alpha Phi Sorority House*, 276 N.W.2d 63, 66 (Minn.1979). Interpreting an ambiguous term is a fact issue. *Turner*, 276 N.W.2d at 66.

We thus proceed to analyze language of the purchase agreement to determine whether there is ambiguity on the disputed issue. The record contains several purchase agreements signed by different purchasers that occasionally differ in detail. For each closing, the primary agreement is seven pages describing the purchase price, mode of payment, and other standard provisions. An integration clause [6] disavows prior promises. After the signature page, most of the agreements include an attachment with specifications, many abbreviated. This specifications document is labeled in different ways and is not always a titled attachment/exhibit. In one agreement it is labeled "summary of common and unit finish standard" and is accompanied by a signed exhibit incorporating it into the agreement. In others it is included as an addendum for "upgrade changes" signed weeks or months after the purchase agreement. The district court found these various documents part of the purchase agreement, and that finding is unchallenged.

The specifications documents contain columns with numerous small-type entries. The first column lists the "category" of construction (e.g., "cabinets," "ceilings"); the middle column is labeled "item"; and the third column is labeled "color." Within those columns are abbreviated descriptions. Descriptions under the "item" heading vary: some are brand names (e.g., "Mohawk" carpet, "Kohler" fixtures, and

"GE" appliances) and some appear to be materials or styles (e.g., "Granite" countertops). Under the "category" heading one subject is "Flooring." The corresponding "item"/"color" "columns" for the "Flooring" row slightly differ among the agreements; this reflects preferences among the different purchasers. In almost all cases, however, the words "Award" and "longstrip" appear.[7] In most specifications documents, the phrase "wood flooring" is also used.

Testimony established that *Award* is the name of the company that manufactured the engineered sheet flooring at issue. Appellants argue that, because the word *Award* appears on these documents and that company specializes in engineered flooring, the contract indicates engineered flooring. This, essentially, is a request that we apply the trade meaning of the word *Award*.

■■ We normally apply the "plain and ordinary meaning" of a contract word or phrase. *Current Tech. Concepts, Inc. v. Irie Enters., Inc.*, 530 N.W.2d 539, 543 (Minn.1995). In some instances, however, we may afford certain trade or special words their trade or special meaning. *Starr v. Starr*, 312 Minn. 561, 563, 251 N.W.2d 341, 342 (1977). But we do not give such effect to specialized terms if surrounding circumstances, contract negotiations, or practical construction demonstrate that the parties contemplated a different meaning. *Id.* Courts also hesitate to apply trade meanings when one party is not a member of that trade or does not otherwise possess the requisite specialized

---

**6.** The integration clause makes the terms of the purchase agreement the sole basis for contract claims. *Lehman v. Stout,* 261 Minn. 384, 389, 112 N.W.2d 640, 643 (1961).

**7.** One agreement, marked as exhibit P–23, does not have the word *Award* anywhere on the document. It just notes the item as *Longstrip*. This purchaser testified that he upgraded to what he thought was Brazilian hardwood floors.

knowledge. *Hartford Fire Ins. Co. v. Clark*, 562 F.3d 943, 946 (8th Cir.2009) (applying Minnesota law and citing Restatement (Second) of Contracts § 202(3)(b) (1981)); *Corbin on Contracts* § 24.15 (1998) ("[A]party who is not a member of a trade is on rare occasion held to a usage of that trade....").

Based on those principals, we conclude that the district court did not clearly err in rejecting appellants' claim that the purchase agreements incorporated a trade meaning. Lack of any evidence that the purchasers had experience in the construction business supports the district court's decision. We also note that the word *Award* was not accompanied by trademark symbols and that the context of its usage—buried within small-type descriptions that sometimes described brands, sometimes described type or material, and sometimes were unclear altogether—would not allow the average person to understand that he or she would receive sheets of engineered flooring with a hardwood veneer of simulated strips. Similarly, the word *Longstrip*, whether capitalized or not, is not readily identifiable as a specific product. If anything, a lay person would understand it to be individual boards that are laid in lengths, not engineered sheets of flooring. In sum, we conclude that the terms *Award* and *Longstrip* are ambiguous, and that the district court did not err in finding that appellants breached a contractual commitment to provide hardwood floors.

## VII.

The seventh issue is whether appellant 301 Clifton breached statutory warranties.

Minnesota's Common Interest Ownership Act (CIOA) provides causes of action for condominium purchasers when sellers breach express and implied warranties.[8] Minn.Stat. § 515B.4–112 (express); Minn. Stat. § 515B.4–113 (implied). These claims must be brought within six years of either when the unit is conveyed or when the purchaser takes possession, whichever is earlier. Minn.Stat. § 515B.4–115(b), (c)(1). Appellants argue that (1) the cause of action was brought after a contractually reduced two-year statute-of-limitations period elapsed; and (2) even if not barred by the statute of limitations, 301 Clifton did not breach any warranties.

### A. Statute of Limitations

■ Parties may reduce by agreement the statute of limitations on CIOA claims to two years. *Id.* (b). To be effective, a limitations reduction "must be evidenced by an instrument separate from the purchase agreement signed by the purchaser." *Id.* Courts generally do not favor limitations-period reductions and construe them strictly against the party invoking them. *Prior Lake State Bank v. Nat'l Sur. Corp.*, 248 Minn. 383, 80 N.W.2d 612, 616 (1957); *Dechter v. Nat'l Council of Knights & Ladies of Sec.*, 130 Minn. 329, 153 N.W. 742, 744 (1915).

■ In this case, the purchasers closed between September 2003 and March 2005. Normally, the limitations period for warranty claims based on those purchases would expire from 2009 to 2011. But the purchasers signed an exhibit that purported to limit the limitations period to

---

8. Respondent also argued appellants violated warranties under the Housing and Home Improvement Statutory Warranties Act, Minn. Stat. § 327A.02 (2008). That statute provides that, in sales of new dwellings, the seller guarantees the premises are free from con-struction defects. Minn. Stat. § 327A.02, subd. 1. The district court found against respondent on this count because, although the premises delivered were different than as promised, they were not built incorrectly. Respondent does not appeal this ruling.

two years. For the last sale, the limitations period would end in March 2007. The amended complaint was not served on 301 Clifton until December 2008.[9] The district court found the exhibit was not a "separate written instrument" and was therefore ineffective. Whether the attached exhibit effectively modified the limitations period involves the application of established facts to a statute and is reviewed de novo as a question of law. *Davies v. W. Publ'g Co.*, 622 N.W.2d 836, 841 (Minn.App.2001), *review denied* (Minn. May 29, 2001).

The parties mainly dispute what it means to be a *separate* instrument. No caselaw has been cited or argued to this court as providing precedent in answering this question. Our goal in interpreting and applying this statute is to effectuate the intent of the legislature. Minn.Stat. § 645.16 (2008). When a statute is not ambiguous, "the letter of the law shall not be disregarded under the pretext of pursuing the spirit." *Id.*

An *instrument* is "[a] written legal document that defines rights, duties, entitlements, or liabilities." *Black's Law Dictionary* 869 (9th ed.2009). A thing is *separate* if it is "set or kept apart; disunited." *The American Heritage College Dictionary* 1264 (4th ed.2002). Here, the statute-of-limitations modification was titled as an exhibit and incorporated into the purchase agreement by the language of the contract. The parties agreed in the contract that the attached modification was not "kept apart" from the purchase agreement. Deferring to this agreement, we conclude that the district court did not err in determining that the modification was not a separate instrument and that the limitations period was not effectively altered.

## B. Breach

 Appellants argue in the alternative that, even if the warranty claims were timely, the district court erred in finding the warranties breached. We discuss whether the units delivered were equipped with promised hardwood floors above in sections V and VI of this opinion. Based on that analysis, we affirm the district court's conclusion that 301 Clifton breached its warranties promising hardwood floors.

## VIII.

 The eighth issue is whether the district court erred by finding 301 Clifton and CP alter egos of Nixon. Both parties agree that the issue should be decided under Nevada law, which provides that an LLC member is not personally liable for the LLC's debts and obligations. Nev. Stat.Rev. § 86.371 (2009). Nevada state courts have not yet held that the alter ego doctrine applies to LLCs, but the parties agree that the doctrine applies based on its past application in a prior federal bankruptcy decision. *See In re Giampietro*, 317 B.R. 841, 845–48 (Bankr.D.Nev.2004).

9. The parties dispute the date when 301 Clifton was served. Although respondent mailed the amended complaint to 301 Clifton in September 2008, the LLC never signed the acknowledgment form. Service by mail was therefore not perfected at that time. Minn. R. Civ. P. 3.01; *see Hajjiri v. First Minn. Sav. Bank F.S.B.*, 25 F.3d 677, 678 (8th Cir.1994) (noting that proper service entails return of acknowledgment form within 20 days of mailing) (citing *Coons v. St. Paul Cos.*, 486 N.W.2d 771, 774–75 (Minn.App.1992)). On December 7, 2008, 301 Clifton was served properly through the secretary of state's office. We also note the potential question of whether the statute of limitations would be determined by the service of the initial complaint rather than the amended complaint. Because the parties have not argued this question and the district court did not consider it, we do not reach it.

The Nevada Revised Statutes codify the test for finding alter ego status:

A stockholder, director or officer acts as the alter ego of a corporation if:

(a) The corporation is influenced and governed by the stockholder, director or officer;

(b) There is such unity of interest and ownership that the corporation and the stockholder, director or officer are inseparable from each other; and

(c) Adherence to the corporate fiction of a separate entity would sanction fraud or promote a manifest injustice.

Nev.Rev.Stat. § 78.747(2) (2009). The statute also calls on courts to treat an alter ego determination as a question of law. *Id.* (3). The fact findings underlying the determination are reviewed for clear error. *See* Minn. R. Civ. P. 52.01.

In this case, the district court made factual findings to support its conclusion that Nixon was the alter ego of both 301 Clifton and CP: (1) Nixon comingled funds between LLC bank accounts and his personal accounts; (2) the LLCs are not adequately capitalized to provide for 301 Clifton's liabilities in that neither company has remaining assets; (3) Nixon treated LLC funds as his own and routinely diverted those funds to his personal account; (4) the timing of the transfers and leaving the LLCs with no assets in the interim shows that Nixon used the LLCs as a corporate fiction for personal business, (5) Nixon was the principal member funding the LLCs and the only member receiving distributions; and (6) the LLCs and Nixon are inseparable. In reviewing the voluminous financial records and testimony, we conclude there is ample evidentiary support for these findings by the district court.

Next, we review the district court's decision to determine whether it comports with the standards established by Nevada law. Here, we first note that the LLCs were operated solely by Nixon: he acted on behalf of the LLCs at all times; he referred to the LLCs as himself; and he made all transfers between accounts at his own discretion. Second, there is unity of interest: Nixon transferred several properties from 301 Clifton to CP for far below market value; he retroactively applied a promissory note to the sale without charging interest and transferred that amount to personal accounts; and he constantly shifted money and assets in a way that the company was a conduit for deposits to his own bank account. And third, injustice would result in adherence to the corporate fiction: the companies have no assets to pay respondent; and Nixon's violation of the MCFA would go unpunished without veil-piercing.

Appellants dispute that 301 Clifton was undercapitalized by noting that Nixon believed a reconvey provision on one of the sold units, which has since been exercised by 301 Clifton to pay other debts, could cover potential liabilities. But even if Nixon believed this asset could satisfy future liabilities, the fact remains that neither 301 Clifton nor CP has any assets to pay respondent. Appellants also claim that Nevada caselaw requires the company be a sham in order to "promote a manifest injustice" under the statute. We do not read such a stringent requirement into the plain language of the Nevada statute. Moreover, prior Nevada caselaw has stated that the injustice requirement under Nevada common law does not require proof of "actual fraud. It is enough if the recognition of the two entities as separate would result in an injustice." *Polaris Indus. Corp. v. Kaplan,* 103 Nev. 598, 747 P.2d 884, 886 (1987). Here, keeping Nixon and his entities separate would allow 301 Clifton to breach warranties, commit fraud, and breach a contract without compensating respondent. We conclude that

these circumstances satisfy the injustice requirement under Nevada law, and we affirm the alter ego determination.

## IX.

 The ninth issue is whether the district court erred by entering judgment against CP without indicating it violated contractual or statutory obligations. The district court only found that 301 Clifton violated contracts and statutes.

 Normally, the district court cannot render judgment against a party that is not found to have violated or breached any statutes or contracts. *See* Minn.Stat. § 546.27, subd. 1 (2008) (noting that "judgment shall be entered accordingly" with findings and conclusions). But here the district court held CP and Nixon liable for 301 Clifton's violations because both LLCs were alter egos of Nixon. "Alter ego" status is an equitable finding that the corporation/LLC and an individual are one and the same. *Black's Law Dictionary* 91 (defining alter ego as a "corporation used by an individual in conducting personal business"). Therefore, an alter ego is liable for the other's faults. *See Victoria Elevator Co. of Minneapolis v. Meriden Grain Co.*, 283 N.W.2d 509, 513 (Minn.1979) (finding shareholder liable for alter ego corporation's debts). Further, the equitable remedy of piercing the corporate veil imposes personal liability on all parties to a lawsuit who disregard the corporate form. *Equity Trust Co. Custodian ex rel. Eisenmenger IRA v. Cole*, 766 N.W.2d 334, 339–40 (Minn.App.2009). In this case, we conclude that the district court did not err in entering judgment against CP.

## X.

 The tenth issue is whether the district court erred in awarding attorney fees. The court awarded attorney fees based on violations of the CIOA. *See* Minn. Stat. § 515B.4–116(b) ("The court may award reasonable attorney's fees and costs of litigation to the prevailing party."). Appellate courts only reverse attorney fee awards if there is an abuse of discretion. *Giuliani v. Stuart Corp.*, 512 N.W.2d 589, 596 (Minn.App.1994).

 Appellant claimed posttrial that the district court did not correctly employ the so-called lodestar method.[10] *See Specialized Tours, Inc. v. Hagen*, 392 N.W.2d 520, 542 (Minn.1986) (adopting process set forth in *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). "When the reasonableness of the requested attorney fees is challenged, the district court must provide a concise but clear explanation of its reasons for the fee award." *Milner v. Farmers Ins. Exchange*, 748 N.W.2d 608, 621 (Minn.2008) (quotations omitted).

In this case, respondent submitted attorney fees through an affidavit with an attached spreadsheet showing detailed accounts of work performed and matching billing rates. The affidavit did not request increases due to results obtained or any other lodestar triggers. The district court awarded $156,355.63 in fees and $19,992.44 in costs to respondent based on these rec-

---

10. Under this method, the district court determines a base hourly rate, considering all relevant factors. *Milner v. Farmers Ins. Exchange*, 748 N.W.2d 608, 620–21 (Minn.2008). Relevant factors can include time and labor required, case difficulty, fees customarily charged for similar services, reputation and ability of counsel, and client fee arrange- ments. *Id.* This lodestar hourly rate is then multiplied by the hours reasonably expended on the litigation to determine the fees. *Id.* The fees may be adjusted by the district court, however, to reflect the degree of success that the party obtained or other exceptional contingencies. *Id.* at 623.

ords. The district court did not use any lodestar principle or otherwise modify the claimed fees to account for any unique factors. The district court did reduce the award for (a) the fees incurred by respondents in the settled garage-space dispute; (b) the fees incurred in connection with the settled claims against KA; and (c) litigation costs concerning an attorney lien on the garage space.

Precedent does not require that the district court state that it is applying the lodestar framework, nor does it require explicit consideration of all possible reasonableness factors (e.g., results, attorney reputation) when it is not increasing from a normal billable rate. The test only requires a "concise and clear summation" of the reasons behind the award. *Id.* at 621. The district court found the submitted fees reasonable and explained its reasons for reducing that amount. We conclude that, based on the extensive documents in the record, the district court adequately explained its award and did not abuse its discretion.

## XI.

The last issue is whether the district court abused its discretion by denying the motion to disclose terms of respondent's settlement with KA. Appellants say the terms may show that respondent received a double recovery for the flooring claims and that this would justify a reduction in respondent's damages. A nonsettling co-defendant "has a definite right to complain if it would be required to pay more than its fair share of the damages." *Oelschlager v. Magnuson,* 528 N.W.2d 895, 900 (Minn. App.1995), *review denied* (Minn. Apr. 27, 1995). As a discovery ruling, the district court's denial of the terms' disclosure is reviewed for a clear abuse of discretion. *Shetka v. Kueppers, Kueppers, Von Feldt*

*& Salmen,* 454 N.W.2d 916, 921 (Minn. 1990).

The settlement between KA and respondent occurred in December 2008 during a court-mandated mediation session. This was two and a half months before trial, at a time when appellant was still represented by counsel. Yet despite this timing, we find no pretrial discovery request for the terms of the settlement within the rather large record on appeal. Appellants' brief notes that appellants "asked the court to compel [respondent] to disclose the terms of the settlement," citing a February 17 transcript. No February 17 transcript is referenced in the docket of proceedings provided to this court as part of the district court file. Without a proper discovery request or motion that indicates that a discovery request was made, we decline to determine whether the district court clearly abused its discretion in not ordering the disclosure of the KA settlement terms.

Even if there was a proper pretrial request, it appears the discovery denial would be within the district court's discretion because there is support in the record for the district court's finding that the claims against KA were different from the damage award against appellants. Liability for the falsely represented floors, the basis for the damages against appellants, is solely traced to them. The claim against KA was for faulty construction.

## DECISION

Based on the foregoing analysis, we conclude that the district court did not err by denying appellant LLCs' claim for relief based on its failure to be represented by an attorney; finding that appellants waived a jury trial; finding that Nixon waived inadequate service; finding that appellants breached statutory warranties, breached the contract, and violated the MCFA; or imposing liability and attorney

fees against Nixon and both of his LLC alter egos. We therefore affirm the district court's entry of judgment. We also grant respondent's motion to strike portions of appellants' brief and addendum and deny appellants' motion to strike respondent's reply in support of the motion to strike.

**Affirmed.**